TACO CABANA, INC., Appellant,

v.

EXXON CORPORATION d/b/a Exxon Co., U.S.A., Appellee.

No. 04–98–00444–CV.

Court of Appeals of Texas, San Antonio.

Sept. 8, 1999.

Rehearing Overruled Oct. 5, 1999.

Luther H. Soules, III, Robinson C. Ramsey, William T. Sullivan, Soules & Wallace, P.C., San Antonio, James P. Wallace, Soules & Wallace, P.C., Austin, M. Stephen Cichowski, Law Offices of Phil Watkins, P.C., San Antonio, for Appellant.

David M. Bates, Exxon Corporation, Houston, Clinard J. Hanby, The Woodlands, for Appellee.

Sitting: CATHERINE STONE, Justice, PAUL W. GREEN, Justice, KAREN ANGELINI, Justice.

## OPINION

Opinion by: CATHERINE STONE, Justice.

This dispute arises out of Exxon Corporation's alleged failure to properly and completely remediate a piece of commercial property it previously leased for use as a gasoline station. Shortly after purchasing the land for use as a restaurant site, Taco Cabana unearthed soil it believed was contaminated. Taco Cabana removed the soil, and eventually sued Exxon, asserting claims of negligence, gross negligence, negligence per se, nuisance, nuisance per se, and trespass, and seeking damages for increased construction costs and lost profits. A jury found in favor of Taco Cabana on claims for trespass and negligence per se, but a take-nothing judgment was entered in favor of Exxon after the trial court granted Exxon's motion for judgment notwithstanding the verdict. For the following reasons, we affirm the trial court's judgment.

FACTUAL AND PROCEDURAL BACKGROUND

From 1960 to 1990, Anderson/LaForge leased the subject property to Exxon Corporation ("Exxon"), who subleased the property to various independent con-

tractors for use as a gas station. In 1990, Exxon closed the station and cleared the lot. Its clearing efforts consisted of removing three fiberglass underground gasoline storage tanks, one fiberglass underground waste oil tank, and all of the fiberglass construction. Three dispensing islands and related piping were also removed, and the station building was razed.

In December 1990, Exxon hired an environmental consulting firm to conduct an initial site assessment ("ISA") to test the soil and groundwater for contamination. Three groundwater wells were installed to test the groundwater, and soil samples were obtained from the area of the removed fiberglass tanks. Water contamination exceeding state action levels[1] was detected in monitor well number three. A few of the soil samples revealed detectable levels of contaminants, but none of the samples contained contamination exceeding state action levels. The excavated areas were subsequently backfilled with clean sand.

On February 7, 1991, Exxon forwarded a copy of its ISA to the Texas Water Commission ("TWC"), now the Texas Natural Resource Conservation Commission.[2] The report detailed the closing procedures Exxon had implemented and the environmental testing results. Exxon also informed the TWC that quarterly testing on the monitor wells would be performed. On March 11, 1991, Exxon filed an Underground Storage Tank Closure Report with the TWC, which, in addition to reporting the required information related to the removal of the four fiberglass tanks, contained the same general information re-

garding the levels of contamination and its plan to conduct quarterly testing. In an attached cover letter, Exxon referenced its previously filed ISA.

On March 26, 1991, the TWC issued an "eight-point action letter," directing Exxon to conduct further testing to determine the degree of remediation necessary to clean the site. This letter, although sent after Exxon had filed its ISA and Underground Storage Tank Closure Report with the TWC, was apparently not sent in response to those reports, but rather in response to internal information provided by a TWC field inspector. The TWC requested the following information from Exxon:

1. A description of the release including the cause, the volume lost, and all measures taken to abate and contain it.

2. A determination of the vertical and horizontal extent of subsurface contamination and an amount of the procedures utilized to support this determination.

3. A site characterization which provides a description of the local soil, geology, and groundwater conditions.

4. A site map drawn to scale indicating the location of the entire underground storage tank system and all nearby buried utilities, structures, and roads. This map should also provide the location of any excavated areas and the collection points for all soil and water samples.

5. Laboratory reports providing the results of all sample analyses and a description of sample collection and analytical procedures.

6. An account of the disposition of contaminated soils and water, recovered product, or any associated wastes.

---

1. The state action level is the point at which the concentration of constituents in the native soil or water requires corrective action. Exceeding an action level warrants further assessment of the site, but does not mandate that site cleanup be undertaken. Action levels are simply levels which signal the need for additional assessment. 30 TEX. ADMIN. CODE § 334.322 (West Pamph. 1999) (Natural Resource Conservation Comm'n, Underground & Aboveground Storage Tanks).

2. Effective September 1, 1993, the Texas Water Commission merged into the Texas Natural Resources Conservation Commission. Act of July 30, 1991, 72nd Legislature, 1st C.S., ch. 3, § 1.085, 1995 Tex. Gen. Laws 4, 42. Throughout this opinion, we will refer to this governing body as the Texas Water Commission.

7. A city or county map depicting the facility's location and photographs documenting observable impacts, excavations, stockpile soils, and any on-site treatment activities.

8. Based upon the results of the assessment, a detailed remedial action plan proposal for the completion of site remediation.

Exxon did not file an additional report in response to the TWC's March action letter. Presumably, it did not do so believing that its previously filed ISA and Underground Storage Tank Closure Report provided all the requested information relevant to the closure of the fiberglass underground storage tank facility. On April 15, 1991, Exxon acknowledged receipt of the action letter and reminded the TWC that it had sent in its ISA in February. Exxon also reminded the TWC that quarterly testing was being performed and stated that the possibility of installing additional monitor wells was being explored. In the spring of 1991, the monitor wells were placed on a quarterly monitoring schedule; all results were properly reported to the TWC. In July 1992, an aquifer air sparging and soil vapor extraction system was installed at monitor well number three to remediate the contamination exceeding state action levels. A fourth monitor well ("MW–4") was also installed.

It is undisputed that all the information Exxon provided to the TWC concerning the decommission of the gas station focused solely on the fiberglass tank field. Exxon did not include in its reports information relating to a former underground tank facility, which ceased to be operative in 1982.

Meanwhile, in February 1992, while Exxon's remedial activities were on-going, Anderson/LaForge conveyed the property to Southmark Corporation.[3] In January 1993, Southmark entered into an earnest money contract to sell the property to SCC Development Corporation. The following month, SCC assigned its interest in the earnest money contract to Taco Cabana, giving Taco Cabana the right to purchase a portion of the property, which included the former service station site. As part of the agreement, SCC provided Taco Cabana with the environmental studies of the property and allowed Taco Cabana a sixty-day period in which to enter and inspect the land to determine its suitability for use as a restaurant site.

It is undisputed that Taco Cabana was aware of Exxon's on-going remediation efforts at the time it entered into the assignment agreement with SCC. It is also undisputed that Taco Cabana was aware that Anderson/La Forge sued Exxon for its alleged refusal to clean the site. James Eliasberg, senior vice president and general counsel at Taco Cabana, testified that based on its knowledge of these events, Taco Cabana "made it very clear to the seller we [would] not close until we had a letter from the Texas Water Commission [confirming that the site was cleared of contaminants]."

In March 1993, Exxon reported to the TWC that the contamination levels on the site met acceptable state standards and requested authority to terminate remedial activity. MW–3, the only well at which contamination exceeded state levels, had remained below cleanup levels for the preceding three quarters. On May 7, 1993, based on a review of the information provided by Exxon, the TWC determined that no further remedial measures were necessary. Exxon was directed to submit a proposal for the removal of the remediation equipment and a final site closure report from which the TWC would determine whether to issue a final closure letter.

3. Several months after this sale, Anderson/La-Forge sued Exxon for breach of its lease agreement for contaminating the property, for Exxon's alleged refusal to clean the site, and for damages associated with the devaluation of the land due to such contamination. Judgment in this case was entered in favor of Anderson/LaForge in 1994.

In April 1993, Southmark conveyed a portion of the land to SCC. On June 17, 1993, Taco Cabana closed the sale for the remainder of the land; Taco Cabana purchased the land "as is" from Southmark. At the time of Taco Cabana's purchase, the TWC had not yet issued a final approval letter.

Shortly thereafter, Taco Cabana began construction on the site. During the initial phases of construction, work stopped after the contractors detected a strong odor of hydrocarbons. The area was excavated and the former tank field, which Exxon had not disclosed in its reports to the TWC, was unearthed. Oily, black-stained pea gravel was discovered near old piping debris. Taco Cabana notified Exxon of its discovery of what it suspected was contaminated soil and requested reimbursement for the cost of further clean up. Exxon did not respond. On July 26, 1993, Taco Cabana collected 42 soil samples for testing, six of which contained detectable levels of contamination. The levels of contamination, however, did not exceed state action levels.[4] Taco Cabana removed the soil, and eventually construction resumed. On July 28, 1993, the TWC issued a final approval letter to Exxon, indicating that no further remediation activity was necessary.

Taco Cabana then filed suit against Exxon, asserting claims of nuisance, trespass, negligence, and negligence per se, to recover damages for increased costs of construction and lost profits. The case was tried to a jury, with only the claims for trespass and negligence per se submitted to the jury. The jury returned a verdict in favor of Taco Cabana, awarding it $58,675.00 for remedial damages, $45,000.00 for lost profits, and $20,000.00 for incidental damages. Exxon filed a motion to enter judgment notwithstanding the verdict asserting essentially three grounds: (1) Taco Cabana's purchase of the property "as is" coupled with Taco Cabana's knowledge that Exxon was involved in ongoing remediation efforts prevented Taco Cabana from establishing causation as a matter of law; (2) Texas law does not recognize a trespass theory of recovery for a subsequent purchaser against a former lessee of the prior owner for the lessee's alleged failure to remove contaminants; (3) the Texas Water Code does not provide for a private cause of action for alleged failure to remediate property in compliance with the TWC's rules and regulations. In addition to the legal arguments asserted, Exxon also challenged the legal sufficiency of the jury's findings. The trial court granted Exxon's motion, concluding that "a directed verdict in favor of [Exxon] would have been proper and there is no evidence of probative force to sustain the verdict of the jury," and entered a take-nothing judgment in favor of Exxon.

### STANDARD OF REVIEW

A judgment notwithstanding the verdict is properly entered when a legal principle precludes recovery, or when there is no evidence upon which a jury could base its findings. *John Masek Corp. v. Davis,* 848 S.W.2d 170, 173 (Tex.App.—Houston [1st Dist.] 1992, writ denied). Affirmance of the trial court's judgment is proper if it is supported by any ground asserted in the motion for judgment notwithstanding the verdict, even if the trial court's assigned rationale for granting the motion is erroneous. *Cf. Kelly v. Diocese of Corpus Christi,* 832 S.W.2d 88, 90 (Tex. App.—Corpus Christi 1992, writ dism'd w.o.j.) (reviewing directed verdict); *Prather v. McNally,* 757 S.W.2d 124, 126 (Tex. App.—Dallas 1988, no writ) (reviewing directed verdict).

### THEORIES OF LIABILITY

1. **Negligence Per Se**

One theory of liability under which Taco Cabana sought recovery against Exx-

---

4. The state action level for TPH (total petroleum hydrocarbons) concentrations is 100 ppm (parts per million). The detectable levels of TPH were 40 ppm, 94 ppm, 36 ppm, 72 ppm, 60 ppm, 35 ppm.

on was negligence per se. An unexcused violation of a statute setting an applicable standard of care constitutes negligence per se if that statute was designed to prevent injury to the class of persons to which the injured plaintiff belongs. *El Chico Corp. v. Poole*, 732 S.W.2d 306, 312 (Tex.1987); *Wal–Mart Stores, Inc. v. Tamez*, 960 S.W.2d 125, 128 (Tex.App.—Corpus Christi 1997, writ denied). Under this theory of liability, Taco Cabana alleged that Exxon failed to remediate the property in compliance with the TWC's rules and regulations and that such action was a proximate cause of damage to Taco Cabana.

The TWC is the regulatory agency responsible for the oversight of the maintenance, installation, removal, and remediation of underground storage tanks. Pursuant to its statutory authority, the TWC promulgated comprehensive rules and regulations for the monitoring and prevention of any release of regulated substances from underground storage tanks, and the remediation and clean-up of releases which do occur. *See* TEX. WATER CODE ANN. §§ 26.345, 26.351 (Vernon 1988); *see also* 30 TEX. ADMIN. CODE § 334.1 et seq. (West Pamp.1999) (Natural Resource Conservation Comm'n, Underground & Aboveground Storage Tanks). The regulations Taco Cabana alleges Exxon violated relate to the reporting procedures for the closure of an underground storage tank facility and the reporting and investigating procedures for suspected leaks.

### 1. *Closing Procedures*

The removal of underground storage tanks triggers certain duties: Any owner or operator who intends to permanently remove an underground storage tank from service is required to submit a closure plan which outlines how the removal and proper disposal of the underground tanks will be achieved. *See* 30 TEX. ADMIN. CODE § 334.508 (West Pamph.1999). The owner or operator is also required to conduct a site assessment to determine whether there has been a prior release of a stored regulated substance from the system. *Id.* at § 334.55(a)(6), (e). The results of the site assessment are forwarded to the TWC, and if, as in the instant case, contamination exceeding state levels is detected, further assessment of the site will be undertaken. The owner or operator will be required to submit a corrective action plan for responding to contaminated soils and groundwater. *See id.* at § 334.81. In response to a report of contamination exceeding state levels, the TWC will then issue an "action letter," which directs further assessment of the site and the remediation process.

### 2. *Reporting of Suspected Releases*

When the owner or operator is notified of actual or suspected leakage of regulated substances at the underground storage tank or in the surrounding area, the owner or operator must report to the appropriate authority within the TWC within 24 hours. *Id.* at § 334.72. The owner or operator is also required to prevent any further release or confirm and investigate suspected releases within 30 days. *Id.* at §§ 334.74, 334.76. The owner or operator must pursue whatever actions are necessary to minimize any immediate impacts or threats to human health and safety and the environment and to stabilize the conditions caused by the release. *Id.* at § 334.320.

### Application of Law to Facts

■ The crux of Taco Cabana's negligence per se claim centers on Exxon's failure to disclose information regarding the former underground tank facility in its reports to the TWC. Exxon claims that if the TWC had been aware of that facility, it likely would not have approved the closure of the site without requiring further testing at or in the vicinity of the former tank field. Part of Taco Cabana's argument is that the soil it unearthed was soil which had been contaminated from the steel tanks that were housed in the former tank field. The other aspect of Taco Cabana's argument focuses on Exxon's failure to respond to the suspected contamination or

to report to the TWC that residual contamination may have been discovered.

The record contains evidence from which the jury could conclude that Exxon failed to comply with the applicable rules and regulations of the TWC. For example, Robert Owens and John Mikels both testified that Exxon omitted relevant information concerning the former tank field—information which arguably should have been disclosed as part of the historical site information the TWC requested in its action letter. And it is undisputed that Exxon did not respond to Taco Cabana's notification of suspected contamination or report the incident to the TWC, even though the TWC had not issued the final closure letter for the site.

■ The evidentiary support for Taco Cabana's claim, however, is legally immaterial if proximate cause is not established. That is, even if the evidence demonstrates an unexcused violation of the regulatory scheme at issue, and even if we assume, without deciding, that Taco Cabana belongs to the class that the regulations upon which it relies are intended to protect, and its injuries—lost profits and increased construction costs—are of the type that the regulations were designed to prevent, *see Perry v. S.N.,* 973 S.W.2d 301, 305 (Tex. 1998), Taco Cabana's claim fails unless Exxon's alleged noncompliance with the TWC's reporting regulations proximately caused Taco Cabana's injuries. *See Hudson v. Winn,* 859 S.W.2d 504, 508 (Tex. App.—Houston [1st Dist.] 1993, writ denied) (op. on rehearing). Proximate cause cannot be established by mere conjecture, guess, or speculation. *Doe v. Boys Clubs of Greater Dallas, Inc.,* 907 S.W.2d 472, 477 (Tex.1995).

In the instant case, although Taco Cabana halted construction due to the strong odor of hydrocarbons, the evidence established that the suspect soil did not contain contamination exceeding state levels. Under such circumstances, corrective action at the site was not required. Further assessment of the site is required when the concentration of constituents in the soil or water exceeds the state action level. Thus, even though Exxon failed to alert the TWC about the former tank field, Taco Cabana was not legally harmed by that omission unless it was established that contamination from the former tanks exceeded state action levels. As previously noted, an action level merely indicates the level at which further assessment is warranted. An action level is not a clean up level.

Taco Cabana argues, however, that the record contains evidence from which the jury could reasonably conclude that contamination exceeded the state action level, which would have triggered the duty to report and potentially the duty to remove. It points to the evidence regarding the strong odor of hydrocarbons, the fact that the levels were close to the state action level, and expert opinion testimony suggesting that it was possible that the level of contamination exceeded state action levels. We are not persuaded by this argument because the evidence upon which Taco Cabana relies to prove its injury is speculative. Exxon is not required to remove and dispose of soil or water which *may exceed* state action limits. The strength of the odor of the contaminants does not indicate the level of concentration of contamination nor provide a basis from which to conclude that levels of contamination exceeded state action levels, thereby triggering certain duties from Exxon. Further, expert testimony agreeing that it was possible that state levels were exceeded does not move us closer to establishing this proposition. As the results suggested, it is quite possible that state action levels were not exceeded. The regulations in place establish what the state considered "clean." To deviate from that standard and impose higher burdens than what is required would be to frustrate that regulatory scheme.

Because the evidence did not establish that Exxon's failure to act legally harmed Taco Cabana, liability does not attach to

Exxon's omissions. *See Hudson*, 859 S.W.2d at 508. We hold, therefore, that the trial court properly disregarded the jury's answer to question number two of the jury charge. *See John Masek Corp.*, 848 S.W.2d at 173. For similar reasons, Taco Cabana's other theory of liability is unavailing.

**2. Trespass**

 Under question one, the jury was charged with determining whether Taco Cabana "knowingly left unreasonable levels of Exxon gasoline contaminants on the property in 1993, which caused damage to Taco Cabana." This question was submitted under the theory that Exxon's failure to remove contaminants from Taco Cabana's property constituted a trespass. Taco Cabana defends the underlying legal theory of this trespass claim, pointing to section 158(c) of the Restatement (Second) of Torts, which provides that a party is subject to liability to another for trespass, irrespective of whether he causes harm to any legally protected interest of another, if he fails to remove a thing which he is under a duty to remove. RESTATEMENT (SECOND) TORTS § 158(c) (1965).

Taco Cabana's reliance on section 158, which speaks to failing to remove from the land something which Exxon was under a duty to remove, begs the question of the duty. We turn again to the applicable regulations to answer this question. To the extent that any common law duties regarding removal of contamination existed, such duties have been displaced by the Water Code and implementing administrative regulations because the Legislature has delegated to the TWC the task of determining appropriate cleanup standards. *See Ryan v. Travelers Ins. Co.*, 715 S.W.2d 172, 175 (Tex.App.—Houston [1st Dist.] 1986, writ ref'd n.r.e.) (where common law is revised by statute, statute controls); *see also Bullock v. Electro–Science Investors, Inc.*, 533 S.W.2d 892, 894–95 (Tex.Civ.App.—Austin 1976, no writ) (where rights do not exist at common law, statute creating right controls). The statutes in place dictate when corrective action is necessary. Thus, "unreasonable levels" of contaminants on the land would be levels which exceeded state action levels. Because the evidence presented at trial did not establish that Exxon failed to remove soil that contained contaminants above state action levels, Taco Cabana failed to establish its trespass theory of liability. Accordingly, the trial court properly disregarded the jury's answer to question number one of the jury charge. *See John Masek Corp.*, 848 S.W.2d at 173.

In light of our disposition related to the issues of liability, we need not address the remaining issues regarding damages. *See* Tex.R.App. P. 47.1. The judgment of the trial court is affirmed.