RONALD HOLLAND'S A–PLUS TRANSMISSION & AUTOMOTIVE, INC. and Holland R. Inc., Appellants,

v.

E–Z MART STORES, INC. and Williams Express, Inc. a/k/a Mapco Petroleum, Inc. and a/k/a Delta Express, Inc., and FaEllen Yates as Executrix of the Will and Estate of James Earl Yates, deceased, Appellees.

No. 04–04–00831–CV.

Court of Appeals of Texas, San Antonio.

Nov. 30, 2005.

---

Richard H. Sommer, Hibler & Sommer, San Antonio, for appellants.

Chris Bunt, Howard, Davis and Bunt, Tyler, Jeffrey C. Elliott, Texarkana, George H. Spencer, Jr., Jeff Jowers, Clemens & Spencer, P.C., San Antonio, for appellees.

Sitting: SARAH B. DUNCAN, Justice (Concurring in the judgment), KAREN ANGELINI, Justice, SANDEE BRYAN MARION, Justice.

## OPINION

Opinion by KAREN ANGELINI, Justice.

Ronald Holland's A–Plus Transmission & Automotive, Inc. and Holland R. Inc. ("the Hollands") sued E–Z Mart Stores, Inc. ("E–Z Mart"), Williams Express, Inc. a/k/a Mapco Petroleum, Inc. and a/k/a Delta Express, Inc. ("Williams Express") and FaEllen Yates, as Executrix of the Will and Estate of James Earl Yates, deceased, ("Yates") for negligence, trespass, and nuisance. The defendants filed traditional and no evidence motions for summary judgment which the trial court granted. The Hollands appealed. We affirm in part and reverse and remand in part.

### BACKGROUND

Throughout the 1980s, Williams Express operated a convenience store and gas station on the land adjacent to the Hollands'

property. In December of 1988, Williams Express removed a 550 gallon waste oil underground storage tank from its property. During the removal, a representative of the Texas Natural Resources Conservation Commission[2] ("the TNRCC") observed several leaks in the tank and detected release of an actionable level[3] of TPH (Total Petroleum Hydrocarbons). Then, in September of 1989, monitoring wells were installed and approximately 250 cubic yards of soil were excavated, with some of the soil being above the action levels. That September, Williams Express sold its convenience store and its underground tank system to Jim Yates, who immediately leased the property to E–Z Mart.

In the summer of 1992, during E–Z Mart's operation of the gas station (through its lease from Yates), a gasoline line leak was discovered and reported to the TNRCC. The gasoline line was removed and replaced, soil samples were collected, and a total of 886 cubic yards of soil were disposed of. In September of 1998, Yates sold his convenience store to E–Z Mart; in December of that same year, Yates was killed in a plane crash, and FaEllen was named executrix of his estate.

In 1998 when E–Z Mart was removing gasoline underground storage tanks from its property, it found contamination in excess of TNRCC action levels. Overall, fifteen groundwater sampling and monitor-

2. In 2002, the TNRCC was renamed the Texas Commission on Environmental Quality or TCEQ. *See* About TCEQ, Texas Commission On Environmental Quality, *http://www.tceq.state.tx.us* (last visited 09/13/05). Previously, it also had been known as the Texas Water Commission ("TWC").

3. The state action level is the point at which the concentration of constituents in the native soil or water requires corrective action. Exceeding an action level warrants further assessment of the site, but does not mandate that site cleanup be undertaken. Action levels are simply levels which signal the need for additional assessment. 30 TEX. ADMIN. CODE. § 334.322 (West Pamph. 1999) (Natural Resource Conservation Comm'n, Underground & Aboveground Storage Tanks).

ing events took place. Because the groundwater gradient is towards the northeast, it directs water and other substances from E–Z Mart's property to the Hollands' adjacent property. According to Extra Environmental, Inc., the company hired by the Hollands to assist in assessing the situation, a gap was left between monitoring wells MW2 and MW7, apparently causing the monitoring wells to miss a portion of the contamination plume that migrated to the Hollands' property. Yet, in January of 1999, after E–Z Mart completed the testing and remedial measures for clean-up required by the TNRCC, the TNRCC issued E–Z Mart a standard form letter stating that it concurred with the recommendation that the site had met the closure requirements and that no further corrective action was necessary.

Meanwhile, the Hollands contracted with Trinity Wireless to lease a portion of their land as a site for a telephone cell tower. In May of 2001, when Trinity Wireless was boring a hole in preparation for the erection of the tower, an explosion occurred. Trinity Wireless then hired Drash Consulting Engineers, an independent environmental engineering firm, to conduct an environmental site assessment to determine the cause of the explosion. Drash's report of the tests on soil and groundwater samples taken from the Hollands' land revealed the presence of several fuel-related constituents, such as Benzene. In 2001, the level of Benzene was eight times above the TNRCC action level; in 2004, it was thirty-four times the action level. According to Drash, because the Hollands' land has been farmland and has never been used for gasoline storage or as a site for dispensing gasoline, the fuel-related compounds and hydrocarbons must have migrated from E–Z Mart's gas station to the Hollands' land. Extra Environmental, Inc.'s report concurred with this opinion. After reviewing Drash's report, Trinity

Wireless terminated its lease of the Hollands' property.

The Hollands filed suit against E–Z Mart and later added Williams Express and FaEllen Yates as co-defendants. E–Z Mart, Williams Express, and Yates filed traditional and no-evidence motions for summary judgment. In response, the Hollands filed special exceptions and objections, which the trial court overruled. Thereafter, the trial court granted summary judgment in favor of E–Z Mart, Williams Express, and Yates, dismissing the Hollands' claims. The Hollands appeal.

## STANDARD OF REVIEW

Under Rule 166a(i), a party may move for a no-evidence summary judgment on the ground that there is no evidence of one or more essential elements of a claim or defense on which an adverse party would have the burden of proof at trial. Tex.R. Civ. P. 166a(i). We review a no-evidence summary judgment de novo by construing the record in the light most favorable to the nonmovant and disregarding all contrary evidence and inferences. *Merrell Dow Pharm., Inc. v. Havner,* 953 S.W.2d 706, 711 (Tex.1997); *Reynosa v. Huff,* 21 S.W.3d 510, 512 (Tex.App.-San Antonio 2000, no pet.). A no-evidence summary judgment is improperly granted when the respondent brings forth more than a scintilla of probative evidence that raises a genuine issue of material fact on the challenged element. Tex.R. Civ. P. 166a(i); *Huff,* 21 S.W.3d at 512. More than a scintilla of evidence exists when the evidence "rises to a level that would enable reasonable and fair-minded people to differ in their conclusions." *Havner,* 953 S.W.2d at 711. Less than a scintilla of evidence exists when the evidence is "so weak as to do no more than create a mere surmise or suspicion." *Huff,* 21 S.W.3d at 512.

When the trial court does not state the specific grounds on which it granted summary judgment, we will affirm if any of the theories advanced is meritorious. *State Farm Fire & Cas. Co. v. S.S. & G.W.*, 858 S.W.2d 374, 380 (Tex.1993).

To obtain a traditional summary judgment, a party moving for summary judgment must show that no genuine issue of material fact exists and that the party is entitled to judgment as a matter of law. TEX.R. CIV. P. 166a(c); *Randall's Food Mkts., Inc. v. Johnson*, 891 S.W.2d 640, 644 (Tex.1995); *Nixon v. Mr. Prop. Mgmt. Co.*, 690 S.W.2d 546, 548 (Tex.1985). In reviewing the grant of a summary judgment, we must indulge every reasonable inference and resolve any doubts in favor of the nonmovant. *Johnson*, 891 S.W.2d at 644; *Nixon*, 690 S.W.2d at 549. In addition, we must assume all evidence favorable to the nonmovant is true. *Johnson*, 891 S.W.2d at 644; *Nixon*, 690 S.W.2d at 548–49. A defendant is entitled to summary judgment if the evidence disproves as a matter of law at least one element of the plaintiff's cause of action. *Lear Siegler, Inc. v. Perez*, 819 S.W.2d 470, 471

(Tex.1991). Once the movant has established a right to summary judgment, the burden shifts to the nonmovant to present evidence that would raise a genuine issue of material fact on the challenged issue. *City of Houston v. Clear Creek Basin Auth.*, 589 S.W.2d 671, 678 (Tex.1979).

### DISCUSSION

#### A. Site-closure Letter as a Bar to Suit

■ Appellees assert that the Hollands failed to present sufficient evidence to prove a prima facie case for trespass, nuisance, and negligence. They argue that a cause of action arising out of the leaks is barred as a matter of law due to the site-closure letter issued by the TNRCC, and that the Hollands failed to present evidence in support of a cause of action arising out of any other leaks. In support of their argument, appellees rely on *Taco Cabana, Inc. v. Exxon Corp.*, 5 S.W.3d 773, 778 (Tex.App.-San Antonio 1999, pet. denied).[4] According to appellees, *Taco Cabana* stands for the proposition that once the TNRCC issues a site-closure letter,[5] subsequent suits by adjacent land

4. Appellees also rely on *Z.A.O., Inc. v. Yarbrough Drive Ctr. Joint Venture*, 50 S.W.3d 531 (Tex.App.-El Paso 2001, no pet.). In *Z.A.O.*, the El Paso Court of Appeals followed our holding in *Taco Cabana*.

5. The TNRCC is the regulatory agency responsible for the oversight of the maintenance, installation, removal, and remediation of underground storage tanks. Pursuant to its statutory authority, the TNRCC promulgated comprehensive rules and regulations for the monitoring and prevention of any release of regulated substances from underground storage tanks, and the remediation and cleanup of releases which occur. *See* TEX. WATER CODE ANN. §§ 26.345, 26.351 (Vernon 1988); *see also* 30 TEX. ADMIN. CODE § 334.1 (2005) (Natural Resource Conservation Comm'n, Underground & Aboveground Storage Tanks); *Taco Cabana*, 5 S.W.3d at 778.

The removal of underground storage tanks triggers certain duties: any owner or opera-

tor who intends to permanently remove an underground storage tank from service is required to submit a closure plan which outlines how the removal and proper disposal of the underground tanks will be achieved. *See* 30 TEX ADMIN. CODE § 334.508 (2005). The owner or operator is also required to conduct a site assessment to determine whether there has been a prior release of a stored regulated substance from the system. *Id.* § 334.55(a)(6), (e). The results of the site assessment are forwarded to the TNRCC, and if, as in the instant case, contamination exceeding state levels is detected, further assessment of the site will be undertaken. The owner or operator will be required to submit a corrective action plan for responding to contaminated soils and groundwater. *See id.* § 334.81. In response to a report of contamination exceeding state levels, the TNRCC will then issue an action letter, which directs fur-

owners seeking damages for trespass, nuisance, and negligence are barred as a matter of law. We disagree.

In *Taco Cabana*, we considered whether a state agency's determination as to the appropriate clean-up level foreclosed a tort cause of action to require further clean-up or to recover damages for failure to clean up the property in question. *Taco Cabana*, 5 S.W.3d at 778. In that case, the owner of the property, Anderson, leased a piece of property to Exxon, who subleased it to another independent contractor for use as a gas station. *Id.* at 774–75. In the process of closing the station, Exxon cleared the lot by removing the underground gasoline waste oil tank, the underground gasoline storage tank, and other constructions. *Id.* at 775. An environmental consulting firm, which was hired to conduct an initial site assessment, detected some contamination in the soil samples. *Id.* The TNRCC issued Exxon an action letter, requiring it to perform further testing and report additional information regarding the site. *Id.* Although Exxon provided information to the TNRCC regarding the fiberglass tank field, it did not include information about the former underground tank facility, which was removed nine years before. *Id.* at 776.

While Exxon was conducting remedial activities, Anderson conveyed the property to Southmart Corporation. *Id.* The following year, Southmark Corporation entered into an earnest money contract with SCC for the sale of the property. *Id.* Soon after, SCC assigned its interest in the earnest money contract to Taco Cabana. *Id.* As part of the agreement, Taco Cabana was provided with the environmental studies of the property, which included the former service station site. *Id.* In addition, it was allowed a sixty-day period to enter and inspect the land assessing its suitability as a restaurant site. *Id.* At the time it entered into the agreement with SCC, Taco Cabana was aware of Exxon's on-going remediation efforts and the suit between Anderson and Exxon for Exxon's alleged refusal to clean the site. *Id.* Taco Cabana and SCC agreed that Taco Cabana would not close on the property until it received a letter from the TNRCC confirming that the site was cleared. *Id.*

A few months later, based on the reports submitted to it by Exxon, the TNRCC determined that no further remedial measures were necessary. *Id.* Thereafter, Taco Cabana closed on the property and purchased it "as is." *Id.* at 777. At the time of closing, the TNRCC's final approval letter had not been issued. *Id.* When Taco Cabana began its con-

---

ther assessment of the site and the remediation process.

When the owner or operator is notified of actual or suspected leakage of regulated substances at the underground storage tank or in the surrounding area, the owner or operator must report the leak to the TNRCC within twenty-four hours. *Id.* § 334.72. The owner or operator is also required to prevent any further release or confirm and investigate suspected releases within thirty days. *Id.* §§ 334.74, 334.76. The owner or operator must pursue whatever actions are necessary to minimize any immediate impacts or threats to human health and safety and the environment and to stabilize the conditions caused by

the release. *Id.* § 334.320; *see also Taco Cabana*, 5 S.W.3d at 778.

Upon completion of corrective action in accordance with the TNRCC's requirements, the agency issues a closure letter in response to the certification of completion of corrective action requirements submitted by the owner or operator. 30 Tex. Admin. Code § 334.81 (2005). The closure letter issued by the TNRCC, based on the information available to it, signifies that the agency agrees that corrective action has been completed for the referenced release in accordance with agency specifications. 30 Tex. Admin. Code § 334.2 (2005).

struction, the contractors detected a strong odor of hydrocarbons, which turned out to be coming from the former tank that Exxon had not disclosed in its report to the TNRCC. *Id.* Although a strong odor had been detected, the soil samples collected on July 26, 1993, did not show contamination in excess of state action levels. *Id.* On July 28, 1993, after the soil was removed and construction resumed, the TNRCC issued a final approval letter to Exxon, stating that no further remediation activity was necessary. *Id.*

Taco Cabana filed suit against Exxon, asserting claims for negligence, negligence per se, trespass, and nuisance. *Id.* Although the jury returned a verdict in favor of Taco Cabana on the issues of trespass and negligence per se, the trial court granted Exxon's motion notwithstanding the verdict, entering a take-nothing judgment. *Id.* On appeal, this court affirmed the trial court's judgment.

In *Taco Cabana*, we stated that "[t]o the extent that any common law duties regarding removal of contamination existed, such duties have been displaced by the Water Code and implementing administrative regulations because the Legislature has delegated to the [TNRCC] the task of determining appropriate cleanup standards." *Id.* at 780. Although we emphasized that the statutes in place dictate when corrective actions were necessary, we concluded that evidence of unreasonable levels of contamination on the land, meaning levels which exceed state action levels, would establish a trespass cause of action. *See id.* In that case, because Taco Cabana had failed to present evidence establishing that Exxon failed to remove soil that contained contaminants above state-action levels, we held that the trial court properly entered judgment notwithstanding the verdict in favor of Exxon. *Id.* Thus, in *Taco Cabana*, we emphasized that

in order to bring a cause of action when proper clean-up measures have taken place in compliance with TNRCC requirements, a plaintiff must show that there are "unreasonable levels" of contaminants, meaning levels *in excess* of actionable levels of contamination. *Taco Cabana*, 5 S.W.3d at 778.

■ Although the TNRCC has broad authority to impose requirements with regard to any contamination, a wrongdoer is not relieved from liability by the Texas Administrative Code, the Water Code, or the TNRCC's regulations for contamination of another's land when it is above the state-action level. *See id.* Although the site-closure letter confirmed that the required clean-up measures had taken place on the E–Z Mart site, if subsequent unreasonable contamination is discovered on adjacent property in excess of state-action level, as in the present case, the site-closure letter does not exonerate appellees from their potential liability for trespass, nuisance, or negligence.

Appellees emphasize that although the Hollands have presented evidence of contaminants on the Hollands' own property, the Hollands have not offered any evidence that there are contaminants exceeding state-action levels on the E–Z Mart site. Although appellees point to *Taco Cabana* and the TNRCC's regulations for support, none of these require the Hollands to show actionable levels of contaminants on the E–Z Mart site to recover damage to their property. Even though the TNRCC confirmed that there are no longer actionable levels on the E–Z Mart site, as discussed below, there is evidence of contamination in excess of state-action levels on the Hollands' land.

### B. Negligence Claim as to E–Z Mart and Yates

■ The elements of negligence are: (1) a legal duty owed by one person to

another; (2) a breach of that duty; (3) the breach was a proximate cause of the injury; and (4) actual injury. *Cain v. Rust Indus. Cleaning Serv.*, 969 S.W.2d 464, 470 (Tex.App.-Texarkana 1998, pet. denied). E–Z Mart and Yates contend that the Hollands failed to prove causation. Causation cannot be proven by mere speculation, and to overcome the no-evidence motion, the Hollands must have presented more than a scintilla of evidence on causation. *See Martinez v. City of San Antonio*, 40 S.W.3d 587, 592 (Tex.App.-San Antonio 2001, pet. denied). Although causation may be proved by expert testimony, the probability about which the expert testifies must be more than coincidence for the case to reach a jury. *Weiss v. Mech. Assoc. Servs.*, 989 S.W.2d 120, 125 (Tex. App.-San Antonio 1999, pet. denied).

Here, the Hollands have produced sufficient evidence showing that the contaminants migrated from the E–Z Mart site to their property and that contamination increased on their property between 2001 and 2004. The Hollands produced CAT-scan aerial photos of the site showing plumes of contamination on their property and the TNRCC's interoffice memorandum which described different activities and measures taken on the E–Z Mart site up until January of 1999. The Hollands also produced a report from Drash Consulting Engineers, Inc., indicating that their property was impacted by petroleum hydrocarbons released from the E–Z Mart site. Furthermore, they produced the affidavit of expert Gary Eaves, Ph.D., who affirmed that he had reviewed the following:

- San Antonio Testing Lab's reports of the core samples of soil gathered on May 5, 2004, showing that the Hollands' property was contaminated by actionable levels of hydrocarbons in both water and soil;

- series of aerial photographs of the Hollands' property taken from a helicopter using Multiple–Image Spectral Scanning Analysis (MSSA), showing the underground gasoline plumes emanating from the E–Z Mart site to the Hollands' land; and

- results from a PID detector, showing positive results for organic vapors found associated with gasoline;

Relying on the above data, Eaves concluded that the contamination on the Hollands' land came from the E–Z Mart site. Eaves ruled out all other potential sources of the hydrocarbon contamination. In ruling out other sources, he relied on the following: (1) the contents of a Phase I environmental report prepared by Nova Consulting Group in December of 2000; (2) public records indicating that the Hollands' property was previously undeveloped farmland; (3) contents of the test results and the Phase II environmental report prepared by Drash Engineering in June of 2001; (4) a letter from Mark P. Hemmingway of International Technology Corporation to Williams Express and another letter from Joe Moulder, both of which described subsurface geology in the area under and around the E–Z Mart site; (5) his examination of the records on file at the TNRCC; and (6) the presence of Methyl Tertiary Butyl Ether ("MTBE"), indicating the age of the gasoline. *See Z.A.O.*, 50 S.W.3d at 539. Eaves' affidavit also included a chart containing data about soil samples collected from the Hollands' land showing levels of benzene contamination eight times above the TNRCC action level in 2001 and thirty-four times the action level in 2004.

Looking at this evidence in the light most favorable to the Hollands, there is more than a scintilla of evidence on causation to support their claim against E–Z Mart and Yates.

*C. Nuisance Claim as to E–Z Mart and Yates*

■ In Texas, nuisance involves a condition which substantially interferes with the use and enjoyment of land by causing unreasonable discomfort or annoyance to persons of ordinary sensibilities attempting to use and enjoy it. *Z.A.O.*, 50 S.W.3d at 542 (citation omitted). A nuisance may occur in one of three different ways: (1) physical harm to property, such as encroachment of a damaging substance or by the property's destruction; (2) physical harm to a person on his property, such as by an assault to his senses or by other personal injury; and (3) emotional harm to a person from the deprivation of the enjoyment of his or her property, such as by fear, apprehension, offense, or loss of peace of mind. *Id.* at 542. To be actionable, "a defendant must generally engage in one of three kinds of activity: (1) intentional invasion of another's interest; (2) negligent invasion of another's interests; or (3) other conduct, culpable because abnormal and out of place in its surroundings, that invades another's interest." *Id.* at 543.

■ The Hollands' evidence supporting their claim of negligence against E–Z Mart also supports their claim of nuisance against E–Z Mart. As discussed, this evidence shows that contaminants migrated from the E–Z Mart site subsoil and interfered with use and enjoyment of the Hollands' land. Thus, the Hollands' issue as to nuisance is sustained.

*D. Trespass Claim as to E–Z Mart and Yates*

■ Trespass to real property requires a showing of an unauthorized physical entry onto the plaintiff's property by some person or thing. *Castano v. San Felipe Agric., Co.*, 147 S.W.3d 444, 452 (Tex. App.-San Antonio 2004, no pet.). The entry need not be in person but may be made by causing or permitting a thing to cross the boundary of a property. *Cain*, 969 S.W.2d at 470. Here, the Hollands produced more than a scintilla of evidence to raise a fact question regarding the unauthorized entry of contaminants onto their property by E–Z Mart and Yates. The Hollands' evidence of the contamination exceeding state action levels, combined with reports from various environmental companies and experts pointing to the E–Z Mart site as the source of the contamination, is more than a scintilla of evidence in support of their trespass claim against E–Z Mart and Yates.[6]

*E. Yates' Additional Argument*

■ Yates, James Yates's executrix, argues that because James Yates sold the property adjacent to the Hollands in 1998, there is no causal connection between James Yates's ownership of the property and the explosion or contamination that was discovered in 2001.

Under the Texas Administrative Code, "[o]wners and operators are responsible for any violations or noncompliant activities resulting from the actions or inactions by any installer, contractor, operator, or other person who is employed or otherwise engaged by an owner or operator of a UST or an AST." 30 Tex. Admin. Code § 334.12(b)(1) (2005). "Owner" is defined as "[a]ny person who holds legal possession or ownership of an interest in an underground storage tank system or an aboveground storage tank." *Id.* § 334.2(73). In addition, where the owner

---

**6.** Because we have determined that summary judgment should not have been granted in favor of E–Z Mart, we need not reach the Hollands' other issues with respect to E–Z Mart.

and the operator are different persons, "[e]ach owner and operator of an underground storage tank or petroleum storage tank ... is responsible for taking all corrective action at the site which may be required ..." TEX. WATER CODE ANN. § 26.3513 (Vernon 2005). The Texas Administrative Code also imposes obligations of reporting, site checking, repair and pursuance of "whatever actions are necessary" to minimize any threats to health or safety. 30 TEX. ADMIN. CODE § 443.320 (2005). Therefore, Yates, as the owner of the property, is liable for any trespass, nuisance, and negligence committed by E–Z Mart with respect to contaminants migrating from his land to the Hollands' land.

*F. Claims as to Williams Express*

 Although the Hollands concede that their evidence against Williams Express is weaker than against the two other parties involved, they assert that contamination on their property has been at least partially caused by Williams Express. Williams Express responds that the Hollands have failed to show any evidence of the causation element of their claim.

Williams Express operated the gas station until September of 1989. After the sale of the property in 1989, Williams Express did not conduct any business or participate in any activities conducted by Yates or E–Z Mart. Eaves, the Hollands' expert, affirms in his affidavit that contaminants most likely migrated from the E–Z Mart site; however, Eaves did not point to Williams Express as the wrongdoer. During oral argument, the Hollands pointed to the Report of Compliance Associated with Excavating an Underground Storage Tank in support of their claim against Williams Express. This report states that on Williams Express's property TPH was above state action limits in September of 1989. However, the Hollands have not

submitted any evidence connecting the presence of the TPH in 1989 with contamination of their land in 2001, or with the explosion, or with the increasing contamination between the years of 2001 and 2004. Even Eaves has given some conflicting testimony with regard to Williams Express's liability, pointing out that it was the E–Z Mart site (owned by Yates) that caused the hydrocarbon pollution and that "the gasoline leaks that caused this pollution occurred while EZ Mart Stores Inc. owned and operated the premises ..."

Furthermore, Eaves's affidavit states that because MTBE did not appear in gasoline sold in Texas until the early 1990s, the presence of MTBE in soil samples indicates the age of the gasoline. Because the lab results of the Hollands' samples of land contained MTBE, the expert concluded that "it is clear that the gasoline contamination that was found on the Holland land in May 2001 and May of 2004, in all likelihood, originated, at least in part, from gasoline sold sometime *after* September of 1989." (emphasis added). We conclude that the Hollands failed to show more than a scintilla of evidence of the causation element of their claim against Williams Express; therefore, we affirm the trial court's no evidence summary judgment as to Williams Express.

 The Hollands also argue that Williams Express's no-evidence summary judgment was improper because it attacked each and every element of their claims, thus, requiring them to marshall all their proof. In response, Williams Express points out that in their motion for summary judgment, the Hollands argued that the motion was too specific and insufficiently global; however, now on appeal the Hollands assert a completely different and almost opposite argument. After reviewing the record, we agree with Williams Express.

**760**

Under the Texas Rules of Civil Procedure, a party may move for no-evidence summary judgment if "there is no evidence of one or more essential elements of a claim or defense on which an adverse party would have the burden of proof at trial. The motion must state the elements as to which there is no evidence." TEX.R. CIV. P. 166(a)(i). Thus, rule 166(a)(i) permits Williams Express to file a no-evidence motion for summary judgment as to one or multiple elements of the Hollands' claims. The rule does not require the Hollands in response to marshall all of their evidence, but only to bring forth more than a scintilla of evidence that raises a fact issue on the challenged elements. *See* TEX.R. CIV. P. 166(a). Thus, the Hollands' issue is without merit. *See Macias v. Fiesta Mart, Inc.*, 988 S.W.2d 316, 316–17 (Tex. App.-Houston [1st Dist.] 1999, no pet.).

### CONCLUSION

Because the Hollands produced more than a scintilla of evidence in support of their claims against E–Z Mart and Yates, we reverse the trial court's summary judgment as to E–Z Mart and Yates and remand the cause for further proceedings consistent with this opinion. However, because the Hollands failed to produce more than a scintilla of evidence of the causation element of their claim against Williams Express, we affirm the trial court's summary judgment with respect to Williams Express.