**Affirmed and Majority and Dissenting Opinions filed November 15, 2012.**



In The

# Fourteenth Court of Appeals

_____

## NO. 14-10-01006-CV
_____

### HOUSTON UNLIMITED, INC. METAL PROCESSING, Appellant

### V.

### MEL ACRES RANCH, Appellee

**On Appeal from the 21st District Court**
**Washington County, Texas**
**Trial Court Cause No. 34002**

## MAJORITY OPINION

Appellant, Houston Unlimited, Inc. Metal Processing ("HUI"), appeals a judgment in favor of appellee, Mel Acres Ranch ("Mel Acres"), on its negligence claim based on HUI's alleged environmental contamination of real property owned by Mel Acres. In three issues, HUI contends Mel Acres failed to obtain an essential jury finding of permanent injury to the property and the evidence is legally and factually insufficient to

support a finding that HUI negligently caused permanent injury to the property, as required to support the damages requested by Mel Acres. We affirm.

## I. BACKGROUND

HUI operates a metal-processing facility in Washington County, Texas. Mel Acres's property is undeveloped ranchland located across Highway 290 from HUI's facility. A culvert flows downhill from HUI's facility, under the highway, and into a stock tank ("the large pond") on Mel Acres's property. Mel Acres's property also contains two "background" ponds, which undisputedly are not hydraulically connected to HUI's property and could not have been affected by HUI's activities.

In late 2007, Mel Acres's lessee, a cattle rancher, complained that a number of its calves had died or experienced various defects. Additionally, someone associated with the lessee had observed an HUI employee "dumping" the contents of a large drum into the culvert and that pipes were discharging materials from HUI's process building. Mel Acres retained an environmental consultant, Geo Strata, whose testing of water samples in December 2007 revealed arsenic, chromium, copper, nickel, and zinc exceeding state action levels in the culvert and copper exceeding state action levels in the large pond.

In December 2007, Mel Acres lodged a complaint with Texas Commission on Environmental Quality ("TCEQ"). On January 2, 2008, David Mann and another inspector from TCEQ made an unannounced visit to HUI's facility and met with Leonard Poenitzsch, its general manager. Mann testified HUI was a "registered large quantity generator," meaning it was permitted to generate hazardous waste in amounts greater than 1,000 kilograms per month but was required to comply with state environmental regulations for discharge of that waste. However, HUI was in violation of applicable regulations at the time of TCEQ's visit because HUI failed to (1) have a storm water permit, (2) implement a "Storm Water Prevention Pollution Plan," to regulate materials that might emanate from the facility via rainwater, (3) maintain updated registration

information, (4) implement a "Source Reduction and Waste Minimization Plan," and (5) maintain the required employee-training program relative to disposal of hazardous wastes.

At trial, Poenitzsch made several admissions regarding HUI's practices before the TCEQ visit: (1) for twenty-five years, HUI had disposed of spent blast media (a substance containing bead-like particles used to clean metal and prepare it for further treatment) and other processing materials behind the facility and used it for fill material; (2) HUI did not have any written environmental policy; (3) except for a two-year period during the 1990s, HUI had no environmental consultant or employee with environmental training to ensure compliance with state law; and (4) Poenitzsch could not substantiate his claim that, for twenty-five years, HUI had properly disposed of "evaporator solids" and "nitriding solids," containing contaminants, in landfills. Poenitzsch agreed "to some extent" with the opinion of HUI's own expert that HUI did not understand the complexities of TCEQ waste regulations.

Mann observed that the area between HUI's process building and the culvert was "crusted over" with white and dark brown sediment, which was soft and moist despite no recent rain. The culvert area contained water with a milky appearance while other pooled water in the culvert had a dark-brown appearance. During the visit, Poenitzsch acknowledged that HUI employees emptied 55-gallon containers of process material onto the ground behind the building on a daily basis, and he pointed out a discharge pipe coming from the building. Poenitzsch told the investigators the milky water contained dissolved oil and the brown water contained spent blast media.

It appeared to Mann that significant discharge had occurred although he was not sure of the duration, and he was "rather surprise[ed] to see the amount of waste associated with the discharge." Further, Mann noticed that there was no berm or other structure, as required, to prevent water containing spent blast media and other processing materials from flowing off-site during rain events. Mann personally observed water flowing from HUI's facility under the highway, through the culvert. The investigators informed

3

Poenitzsch that HUI was illegally discharging industrial waste into and adjacent to state waters and instructed HUI to immediately cease this activity.

During the January visit, TCEQ obtained soil and water samples, both on-site and off-site, and testing for certain "constituents of concern" yielded the following results:

> On-site at the HUI facility—in the culvert area behind the process building: surface water sampling revealed chromium, copper, lead, nickel, and zinc exceeding state action levels and pH level above 12.5, which is considered "corrosive and hazardous"; and soil sampling reflected aluminum and chromium exceeding state action levels.

> Off-site—in the culvert between HUI's property line and Highway 290: water sampling revealed chromium, copper, aluminum, and zinc exceeding state action levels; soil sampling revealed aluminum exceeding state action levels.

> Mel Acres large pond: water sampling reflected copper exceeding state action levels; no soil samples were taken.[1]

Based on these results, TCEQ concluded that an unauthorized discharge of industrial hazardous waste occurred at the HUI facility and affected Mel Acres's property. TCEQ formally cited HUI for failure to prevent the discharge of industrial hazardous waste into or adjacent to waters of the state and ordered HUI to cease all discharge activity and initiate clean-up activities. Mann referred the matter to the applicable TCEQ subdivision for an enforcement action, which ultimately resulted in HUI's payment of a fine. In the referral, Mann noted that the potentially affected area was the entire Brazos River basin, as the ultimate destination of drainage from HUI's facility. Relative to assessment of the fine, TCEQ concluded HUI did not meet the TCEQ "good faith criteria" because its activity was either negligent or intentional.

Meanwhile, within a week after the TCEQ visit, HUI discovered two pipe leaks of nitriding rinse water, which has a high pH content, in its processing system, replaced the

---

[1] Although the other materials for which TCEQ and other consultants tested are metals, Mel Acres's expert explained that pH is a parameter by which to judge water quality. For ease of reference, we refer to all metals and pH for which various parties tested as "the constituents."

4

pipes at issue, and installed a secondary containment mechanism in the event of another leak. Additionally, HUI constructed a berm and a dam so that water no longer flowed from HUI's facility onto Mel Acres's property and ceased dumping spent materials behind the facility.

TCEQ also required HUI to perform an "Affected Property Assessment Report" ("APAR") relative to Mel Acres's property, which Mann explained is required when there has been a discharge onto other property and means TCEQ has already designated the subject property as "affected." HUI hired Quest Consulting, Inc. to perform the APAR. In February and May of 2008, Quest obtained samples from the large pond and tested for constituents used in HUI's processes and those that had been tested by TCEQ. Quest's sampling revealed no constituents exceeding state action levels in water samples from the large pond although it detected exceedances of chromium and nickel in sediment samples from the large pond. Thus, Quest concluded there was no evidence that HUI's activities had any adverse ongoing impact on water quality in the large pond.

In February 2009, Quest submitted the APAR. TCEQ notified Quest that the APAR was deficient because an Ecological Risk Assessment ("ERA") was also required. In November 2009, Quest submitted the ERA. In April 2010, TCEQ notified Quest that it approved the ERA but not the APAR. With respect to the ERA, the TCEQ employee who reviewed the report noted in an internal memorandum, "Overall, this ERA was very detailed and well organized and I concur with the conclusions that there is no unacceptable risk to the ecological receptors in the intermittent stream and stock tank at the Mel Acres Ranch property." TCEQ provided Quest with various comments relative to additional requirements for the APAR. At the time of trial (June 2010), TCEQ had not yet approved the APAR, which meant the matter was still open and TCEQ could require further testing.

Mel Acres's hired its own experts, a company named "Malcolm Pirnie." In May 2009, Malcolm Pirnie obtained sendiment and surface water samples from the large pond, the culvert, and one background pond and tested for arsenic, aluminum, barium,

5

chromium, copper, iron, nickel, zinc, and pH. Its sampling of water in the large pond revealed only pH, aluminum, and iron exceeding state action levels and detectable concentrations of several other constituents, albeit not exceeding state action levels. Malcolm Pirnie concluded in its report, and reiterated at trial, that the large pond remained "adversely affected," and Mel Acres's property has been "devastated" as a "functioning property" and limited in future use by HUI's discharge of materials.

In contrast, at trial, the Quest representative opined that pH, iron, and aluminum exceedances in the large pond were caused by sources other than HUI, citing, in part, the fact that exceedances of these constituents were also found in a background pond. He further opined that constituents below state action levels detected by Malcolm Pirnie in the large pond had no adverse ecological impact on the pond.

Mel Acres sued HUI for trespass, nuisance, and negligence. Mel Acres alleged that it suffered permanent damage, measured by loss in market value of the property. A jury found that HUI did not create a permanent nuisance on the property or commit trespass. However, the jury found that HUI's negligence proximately caused "the occurrence or injury in question" and assessed $349,312.50 as the difference in market value of the property before and after "the occurrence." On July 15, 2010, the trial court signed a final judgment awarding Mel Acres $349,312.50 in actual damages, pre-judgment interest of $42,965.45, court costs of $14,711.65, and post-judgment interest. HUI filed a motion for judgment notwithstanding the verdict or alternatively motion for new trial, which was denied by operation of law.

## II. SUFFICIENCY OF THE EVIDENCE

In its second and third issues, HUI contends the evidence is legally and factually insufficient to prove that HUI caused permanent injury to Mel Acres's property and any reduction in Mel Acres's property value. We will first address these issues because our analysis is also pertinent to our disposition of HUI's first issue, contending Mel Acres failed to obtain a jury finding of permanent injury.

6

When reviewing legal sufficiency of the evidence, we review the evidence in the light most favorable to the challenged finding and indulge every reasonable inference that would support it. *City of Keller v. Wilson*, 168 S.W.3d 802, 822 (Tex. 2005). We credit favorable evidence if a reasonable fact finder could and disregard contrary evidence unless a reasonable fact finder could not. *Id.* at 827. The evidence is legally sufficient if it would enable a reasonable and fair-minded person to reach the verdict under review. *Id.* There is "no evidence" or legally insufficient evidence when (a) there is a complete absence of evidence of a vital fact, (b) the court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact, (c) the evidence offered to prove a vital fact is no more than a mere scintilla, or (d) the evidence conclusively establishes the opposite of the vital fact. *See id.* at 810; *Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex. 1997). The fact finder is the sole judge of witness credibility and the weight to give their testimony. *See City of Keller*, 168 S.W.3d at 819.

When reviewing factual sufficiency of the evidence, we consider all the evidence and will set aside the finding only if the evidence supporting the finding is so weak or so against the overwhelming weight of the evidence that the finding is clearly wrong and unjust. *Maritime Overseas Corp. v. Ellis*, 971 S.W.2d 402, 406–07 (Tex. 1998); *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986) (per curiam). We may not substitute our own judgment for that of the trier of fact or pass upon the credibility of witnesses. *See Ellis*, 971 S.W.2d at 407. The amount of evidence necessary to affirm a judgment is far less than that necessary to reverse a judgment. *GTE Mobilnet of S. Tex. v. Pascouet Ltd. P'ship*, 61 S.W.3d 599, 616 (Tex. App.—Houston [14th Dist.] 2001, pet. denied).

By the time of trial, Mel Acres disavowed any claim for temporary damages and sought only permanent damages—measured by dimunition in market value as a result of contamination. Indeed, the parties do not dispute that, when property is permanently damaged, the appropriate measure of damages, available to the owner, is lost market value. *See Schneider Nat'l Carriers, Inc. v. Bates*, 147 S.W.3d 264, 276 (Tex. 2004); *Pickens v.*

7

*Harrison*, 252 S.W.2d 575, 582 (Tex. 1952); *Trinity & S. Ry. Co. v. Schofield*, 10 S.W. 575, 576 (Tex. 1889); *Garey Constr. Co. v. Thompson*, 697 S.W.2d 865, 867 (Tex. App.—Austin 1985, no writ).

HUI does not challenge sufficiency of the evidence to support the finding that it was negligent with respect to discharge of constituents from its facility into the culvert or dispute such discharge caused temporary contamination of Mel Acres's large pond. Rather, HUI contends it caused, at most, temporary injury to the large pond, which was alleviated within weeks of its occurrence, and Mel Acres presented no evidence HUI caused permanent injury; thus, Mel Acres could not attribute any alleged lost market value to HUI. HUI also challenges the lost-market-value calculations of Mel Acres's damages expert.

## A.    Permanent Damage

According to HUI, as a matter of Texas law, a plaintiff in an environmental-contamination case cannot prove permanent injury to its property unless constituents on the property exceed state action levels. HUI argues no constituents exceeding state action levels that remained in Mel Acres's large pond could be linked to HUI.

HUI does not quarrel with the Geo Strata or TCEQ findings of copper exceeding state action levels in the large pond in, respectively, December 2007 and January 2008 sampling. However, HUI characterizes these findings as a temporary event, emphasizing that testing by its expert shortly thereafter revealed no constituents exceeding state action levels, including copper, in the large pond. HUI also acknowledges the May 2009 sampling by Mel Acres's expert, Malcolm Pirnie, which reflected pH, aluminum, and iron exceeding state action levels in the large pond.

However, relative to the pH, HUI argues Mel Acres failed to prove HUI caused the elevated level or that this level would remain permanent because (1) the highest pH reading

on Mel Acres's property (10.8) was detected in a water sample from the background pond, which undisputedly could not have been affected by HUI's activities,[2] (2) Malcolm Pirnie admitted at trial it had no opinion on the level of pH that might have existed at a sample point in the large pond "had HUI never been there," (3) Malcolm Pirnie acknowledged, "we didn't attempt to say what the pH [in the large pond] would be in the future," and (4) Malcolm Pirnie returned to the property in 2010—about a year after the May 2009 sampling and shortly before trial—but did not perform any testing, even for pH, despite knowing that pH was at issue.

Relative to aluminum and iron, HUI argues that Mel Acres failed to prove HUI caused elevated levels of these constituents because (1) the background pond also had concentrations of aluminum and iron exceeding state action levels, (2) Malcolm Pirnie provided no opinion regarding the source of aluminum in the large pond, (3) Malcolm Pirnie acknowledged it conducted no statistical analysis to demonstrate irons levels in the large pond were different than levels in the background pond, and (4) Malcolm Pirnie presented no evidence to refute the statistical analysis by Quest, HUI's expert, showing HUI could not have caused the iron levels in the large pond.

Finally, HUI also relies on the fact that TCEQ approved HUI's ERA and concurred with Quest's conclusion that "there was no unacceptable risk to the ecological receptors" in the large pond.

According to Mel Acres, it proved that HUI permanently injured the large pond because (1) it presented evidence that HUI caused exceedances of state actions levels, including the elevated pH in the large pond, but (2) Texas law does not require existence of constituents exceeding state action levels to maintain a negligence action, and Mel Acres proved other contaminants in the large pond were attributable to HUI, and (3) it will take significant time before restoration of the large pond to "background levels."

---

[2] This pH reading in the background pond, referenced by HUI, was revealed in sampling obtained by Mel Acres's lessee in December 2007.

Alternatively, Mel Acres suggests that, even if the contamination were temporary, it nevertheless suffered permanent damage because even the temporary contamination created a permanent stigma on the property, resulting in lost market value.

We need not decide whether Mel Acres proved permanent contamination of the large pond because we agree that Mel Acres proved permanent damage causing lost market value by virtue of permanent stigma created by even the temporary contamination.[3]  We will first address HUI's suggestion that recovery of such stigma damages is precluded under Texas law and then outline the evidence supporting recovery of such damages in the present case.

1.      **Recovery of stigma damages due to temporary contamination**

HUI asserts no Texas court has held that a property owner may recover damages for a stigma on its property.  However, HUI does not cite any Texas authority precluding recovery of lost market value due to stigma.

In this regard, HUI equates the permanent damage prerequisite to recovery of lost market value to permanent *physical* damage.  However, the existing authority requiring such permanent *damage* prerequisite to recovery of lost market value does not dictate that the permanent damage must be *physical*—in this case, permanent *contamination*. Specifically, in the cases cited by both parties for the proposition that lost market value is the appropriate measure of damages for permanent damage to property, there was no issue presented on whether a permanent stigma that diminished market value satisfied the permanent-damage requirement.  *See generally Bates*, 147 S.W.3d 264; *Pickens*, 252 S.W.2d 575; *Schofield*, 10 S.W. 575; *Garey Constr. Co.*, 697 S.W.2d 865.

---

[3] Because we need not decide whether Mel Acres proved permanent contamination to the large pond, we have outlined only HUI's contentions regarding the state of the evidence relative to the issue of permanent damage and have not outlined any controverting evidence presented by Mel Acres or instances in which Malcolm Pirnie qualified or clarified the testimony cited above by HUI.

As mentioned above, HUI cites several cases to support its argument that Mel Acres cannot, as a matter of law, prove permanent physical contamination of the property without establishing constituents exceeding state action levels remain in the large pond. However, in response to Mel Acres's stigma contention, HUI also cites these cases as authority that Mel Acres may not recover even for permanent stigma resulting from temporary physical contamination for the same reason—a party may not recover any form of permanent damages without establishing that constituents exceeding state action levels remain on its property. We disagree that these cases support such a proposition.

HUI first relies on *Taco Cabana, Inc. v. Exxon Corp.*, 5 S.W.3d 773 (Tex. App.—San Antonio 1999, pet. denied) and *Z.A.O., Inc. v. Yarbrough Drive Center Joint Venture*, 50 S.W.3d 531, 543–44 (Tex. App.—El Paso 2001, no. pet.), in which the court followed *Taco Cabana*. In *Taco Cabana*, the plaintiff purchased property on which the defendant had previously operated a gas station. 5 S.W.3d at 774–76. When closing its gas station, the defendant detected contaminants exceeding state action levels in water samples and contaminants which did not exceed state actions level in soil samples. *Id.* at 774–75. As required by the Texas Water Commission, the defendant initiated measures to remediate contamination exceeding state action levels. *Id.* at 775–76. Ultimately, the Commission issued a final approval letter, indicating no further remediation activity was necessary. *Id.* at 777. While constructing a restaurant on the property, the plaintiff discovered additional soil contaminants that did not exceed state action levels in the area of a former tank field, which had not been disclosed by the defendant to the Commission. *Id.* The plaintiff removed the contaminated soil before resuming construction and eventually sued the defendant, seeking to recover the remediation costs and lost profits. *Id.*

In the portion of the court of appeals's opinion cited by HUI, the court upheld the trial court's grant of the defendant's motion for judgment notwithstanding the verdict after the jury awarded damages for trespass. *Id.* at 777, 780. Relative to the trespass claim, the jury was charged with determining whether the defendant "knowingly left

11

unreasonable levels of . . . gasoline contaminants on the property . . . which caused damage to [the plaintiff]." *Id.* at 780. The plaintiff contended that the defendant committed trespass because it had a duty to remove the contaminated soil at issue. *Id.* However, the court concluded that any common-law duties to remove contamination had been displaced by the applicable administrative regulations because the Legislature had delegated to the Commission the task of determining appropriate clean-up standards. *Id.* Because the applicable regulations dictate when corrective action is necessary, "unreasonable levels" of contaminants are those that exceed state action levels. *Id.* Therefore, the plaintiff did not establish its trespass action because there was no evidence that the defendant failed to remove soil containing contaminants exceeding state action levels. *Id.*; *see also Yarbrough*, 50 S.W.3d at 543–44 (citing *Taco Cabana* when holding gas-station lessee was not liable in trespass to lessor for contamination of property in unreasonable levels because State provided closure letter stating that any constituents caused by leak in lessee's storage tank had been corrected below actionable levels).

Contrary to HUI's suggestion, the *Taco Cabana* and *Yarbrough* courts did not broadly hold that a plaintiff may never prevail against a defendant for contamination of the plaintiff's property without ongoing presence of constituents exceeding state action levels. *See Yarbrough*, 50 S.W.3d at 543–44; *Taco Cabana*, 5 S.W.3d at 780. The issue in the present case relative to the negligence claim is not confined to the more narrow inquiries in *Taco Cabana* or *Yarbrough* of whether the defendants committed trespass because they left "unreasonable levels" of contaminants on the plaintiff's property. *See Yarbrough*, 50 S.W.3d at 543–44; *Taco Cabana*, 5 S.W.3d at 780. The *Taco Cabana* and *Yarbrough* courts court did not address whether the plaintiffs could recover in negligence for lost market value due to the stigma resulting from former contamination via constituents exceeding state action levels. *See Yarbrough*, 50 S.W.3d at 543–44; *Taco Cabana*, 5 S.W.3d at 780.

HUI also relies on two interrelated cases: *Ronald Holland's A-Plus Transmission & Automotive, Inc. v. E-Z Mart Stores, Inc.*, 184 S.W.3d 749 (Tex. App.—San Antonio 2005,

no pet.) ("*E-Z Mart I*"); and *E-Z Mart Stores, Inc. v. Ronald Holland's A-Plus Transmission & Automotive, Inc.*, 358 S.W.3d 665 (Tex. App.—San Antonio 2011, pet. denied) ("*E-Z Mart II*"). In *E-Z Mart*, one defendant owned and operated a gas station adjacent to the plaintiffs' property. *E-Z Mart I*, 184 S.W.3d at 752. The defendant experienced contamination of groundwater beneath the station because of leaks in the underground storage system. *Id.* at 752–53. After the defendant performed remediation required by Texas Natural Resources Conservation Commission (TCEQ's predecessor), the Commission determined no further corrective action was required and issued a site-closure letter. *Id.* at 753. Several years later, the plaintiffs discovered their property was contaminated by fuel-related compounds which allegedly migrated from the defendant's station. *Id.* The plaintiffs sued this defendant and another party, who formerly owned the station property during relevant periods, for negligence, nuisance, and trespass. *Id.* at 752–53. The trial court granted summary judgment for the defendants on the ground that the plaintiffs' claims were barred as a matter of law because the Commission had issued the site-closure letter. *Id.* at 753–54.

The court of appeals disagreed, reasoning that the fact there were no longer contaminants exceeding state action levels remaining on the defendant's property did not exonerate it from liability for any contamination of the plaintiffs' property in excess of state action levels. *Id.* at 756. The court reversed the summary judgment because the plaintiffs presented evidence of contaminants exceeding state action levels on its property. *Id.* at 756–58. *E-Z Mart II* was the defendant's subsequent appeal after a jury verdict in favor of the plaintiffs. 358 S.W.3d at 668–69. When concluding the evidence was legally sufficient to support the jury's award of the plaintiffs' lost market value, among other damages, on negligence and nuisance theories, the court reiterated its earlier opinion as holding, "as long as 'there is evidence of contamination in excess of state-action levels on the [plaintiffs'] land' damages are recoverable." *Id.* at 673 (quoting *E-Z Mart I*, 184 S.W.3d at 756).

13

We conclude that the *E-Z Mart* cases also are not controlling in the present case. We recognize the court generally suggested that contamination of a plaintiff's property via constituents exceeding state action levels is required to recover damages. *See E-Z Mart I*, 184 S.W.3d at 756; *E-Z Mart II*, 358 S.W.3d at 673. However, the court did not specifically state that such levels must remain ongoing in order for the plaintiff to recover damages. *See generally E-Z Mart I*, 184 S.W.3d at 756; *E-Z Mart II*, 358 S.W.3d at 673. More specifically, the court did not address the issue involved in the present case: whether the plaintiff was permitted to recover lost market value resulting from stigma created by former contamination of its property via constituents that *did* exceed state action levels. *See E-Z Mart I*, 184 S.W.3d 749; *E-Z Mart II*, 358 S.W.3d 665. Indeed, there was no such issue presented in *E-Z Mart* because the plaintiffs did present evidence of ongoing contamination via constituents exceeding state action levels. *See E-Z Mart I*, 184 S.W.3d at 756–58; *E-Z Mart II*, 358 S.W.3d at 672–76.

Instead, several sister courts have allowed recovery for stigma damages from a remediated physical injury to real estate, albeit in contexts other than environmental contamination. For instance, in *Royce Homes, L.P. v. Humphrey*, 244 S.W.3d 570, 573–74 (Tex. App.—Beaumont 2008, pet. denied), the plaintiff claimed his home was flooded due to the defendant's wrongful diversion of surface water while performing construction on an adjacent property. At trial, the plaintiff presented a real-estate appraiser who testified that, based on his experience, flooded homes, even when the flood has occurred only once, generally suffer a diminished market value due to permanent stigma. *Id.* at 575–76. After citing other Texas cases allowing stigma-damage awards in real-estate cases, the court concluded the plaintiff presented legally sufficient evidence that his home suffered diminished market value and these damages were permanent, although the court ultimately held the expert's opinion was insufficient to prove the amount of diminished market value. *Id.* at 577–80; *see Country Village Homes, Inc. v. Patterson*, 236 S.W.3d 413, 443–44 (Tex. App.—Houston [1st Dist.] 2007, pet. granted, judgm't vacated w.r.m.) (allowing homeowner to recover, in suit against builder for defective

14

construction of home, difference in market value between home if properly constructed and home, as repaired, due to stigma); *Perry Homes v. Alwattari*, 33 S.W.3d 376, 386 (Tex. App.—Fort Worth 2000, pet. denied) (allowing homeowners to recover against their construction company for dimunition in fair market value remaining after repair of defective foundation as actual damages for economic loss recoverable under DTPA).

Moreover, courts in several other jurisdictions have allowed recovery in environmental contamination cases when a defendant caused temporary physical injury to the plaintiff's property but, despite remediation, the property's market value remains depressed due to stigma. We find these cases persuasive.

For example, in *Walker Drug Co., Inc. v. La Sal Oil Co.*, 972 P.2d 1238, 1245–48 (Utah 1998), the Supreme Court of Utah, addressing an issue of first impression, held that a property owner was allowed to recover for lost market value due to the stigma created by temporary contamination of its property from a neighboring gas station. The court recognized that permanent damage to land does not necessarily entail a finding of permanent *physical* damage. *See id.* at 1246. Rather,

> Stigma damages are a facet of permanent damages, and recovery for stigma damages is compensation for a property's diminished market value in the absence of "permanent 'physical'" harm. . . . A majority of courts from other jurisdictions . . . allows recovery when a defendant's trespass or nuisance has caused some *temporary* physical injury to the property but, despite the temporary injury's remediation, the property's market value remains depressed. . . . Thus, stigma damages compensate for loss to the property's market value resulting from the long-term negative perception of the property in excess of any recovery obtained for the temporary injury itself.

*Id.* (internal citations omitted). The court reasoned, "Were this residual loss due to stigma not compensated, the plaintiff's property would be permanently deprived of significant value without compensation." *Id.* The court pronounced that stigma damages are therefore recoverable in Utah when a plaintiff demonstrates (1) the defendant caused some temporary physical injury to plaintiff's land and (2) repair of this temporary injury will not

15

return the value of the property to its prior level because of a lingering negative public perception. *Id.* at 1246–47.

The Utah court cited *In re Paoli R.R. Yard PCB Litigation*, 35 F.3d 717. 797–98 (3rd Cir. 1994), in which the court, applying Pennsylvania law, recognized that normally, courts must award damages for diminution of value only when property cannot be repaired; however, the market sometimes fails and repair costs are not fully compensatory and absent compensation for this remaining loss, a plaintiff is permanently deprived of significant value without compensation. Consequently, the court interpreted Pennsylvania law as allowing a plaintiff to recover for diminished value of its property without showing permanent physical damage if (1) the defendant has caused some temporary physical damage to the plaintiff's property, (2) the plaintiff demonstrates repair of this damage will not restore the property value to its prior level, and (3) the plaintiff shows there is some ongoing risk to the land. *Id.* at 798; *see also Terra–Products, Inc. v. Kraft Gen. Foods, Inc.*, 653 N.E.2d 89, 93 (Ind. Ct. App. 1995) (citing *In re Paoli* when holding Indiana law permits recovery of stigma damages for lost market value of property after remediation of environmental contamination because this rule is consistent with basic principle that damages are intended to fairly and adequately compensate plaintiff for its loss).

We agree with the reasoning of these courts, as well as the conclusions reached by our sister courts, as cited above. Axiomatically, actual damages are intended to compensate a plaintiff for its loss. *See Geters v. Eagle Ins. Co.*, 834 S.W.2d 49, 50 (Tex. 1992) (recognizing that "damages" are defined as "compensation in money imposed by law for loss or injury"); *Marauder Corp. v. Beall*, 301 S.W.3d 817, 822 (Tex. App.—Dallas 2009, no pet.) (stating that "sole purpose of actual damages is compensation"); *Jordan v. Cartwright*, 347 S.W.2d 799, 801 (Tex. Civ. App.—Fort Worth 1961, no writ) ("Generally, one who is injured by the act of another is entitled to recover compensation for the loss or prejudice suffered so that as nearly as possible the

16

compensation received will be commensurate with his loss."). Quite simply, if recovery were precluded even when lost market value results from a stigma remaining after remediation of physical contamination, Mel Acres would have no recourse for such a loss.

HUI asserts that Texas law does not allow a landowner to recover for "fear" or "apprehension" without physical injury to the property. HUI cites *Maranatha Temple, Inc. v. Enterprise Products Co.*, 893 S.W.2d 92, 99–100 (Tex. App.—Houston [1st Dist.] 1994, writ denied), in which the court refused to permit a nuisance-in-fact cause of action based on fear, apprehension, or other emotional reaction resulting from the lawful operation of industries in Texas without injury to "land or body." Similarly, HUI cites two cases as authority that a plaintiff may not assert a negligence claim when the only injury claimed is economic loss. *See Hou-Tex, Inc. v. Landmark Graphics*, 26 S.W.3d 103, 107 (Tex. App.—Houston [14th Dist.] 2000, no pet.) (stating, "Under the economic loss rule, economic damages are not recoverable unless they are accompanied by actual physical harm to persons or their property"); *see also Coastal Conduit & Ditching, Inc. v. Noram Energy Corp.*, 29 S.W.3d 282, 285–90 (Tex. App.—Houston [14th Dist.] 2000, no pet.). However, *Maranatha* and this economic-loss principle are inapplicable in the present case because there was a physical injury to Mel Acres's property, even if remediated. Mel Acres does not seek damages for some abstract fear or apprehension that it might suffer a loss but instead seeks a measure of damage flowing from actual contamination of its property.[4]

---

[4] In fact, the Utah court specifically declined to address whether damages for stigma may be recovered absent any former physical injury to the property. *See Walker Drug Co.*, 972 P.2d at 797 n.10; *see also In re Paoli*, 35 F.3d at 798 n.64 (distinguishing cases prohibiting recovery of stigma damages based solely on fact that plaintiff's property is in vicinity of contaminated site or other activity which might create fear and instead holding there must be some physical damage to plaintiff's property before stigma damages are recoverable). We do not hold that stigma damages may be recovered absent some physical injury to the property. We need not address that issue because Mel Acres proved a temporary physical injury from HUI's activities and HUI does not challenge sufficiency of the evidence to support a finding that it caused such an injury.

17

Finally, HUI suggests that Mel Acres's stigma contention is a new cause of action raised for the first time on appeal. We disagree. As explained below, at trial, Mel Acres not only claimed permanent contamination but also presented evidence supporting a theory that it sustained lost market value due to stigma even if the contamination was only temporary and argued such theory to the jury. Further, such contention is merely encompassed within the negligence claim and thus does not constitute a separate cause of action. In particular, lost market value due to stigma even from temporary contamination was merely one manner in which Mel Acres claimed it was permanently damaged as a result of HUI's negligence in discharging constituents onto Mel Acres's property.

Accordingly, we conclude that Mel Acres is not precluded under Texas law from recovering lost market value due to stigma, as a form of permanent damage, when the evidence shows the stigma resulted from a physical injury.

## 2. Evidence of stigma damages due to temporary contamination

Although not presented as a damages expert, Malcolm Pirnie confirmed that, from the standpoint of an environmental expert, environmental impact gives property a stigma because any purchaser can obtain the TCEQ files, which are public records. As its damages expert, Mel Acres presented the testimony of Kathy McKinney, a licensed real estate appraiser, with twenty years of experience appraising property in Washington County. McKinney concluded that there is a permanent stigma attached to Mel Acres's property because of contamination, which has reduced the market value. She reached this conclusion by consulting with cattle ranchers, investors, real estate brokers, and financial institutions to ascertain their views regarding properties with environmental stigma and researching comparable properties (other contaminated properties in the area) to determine the percent reduction in market value due to the stigma. McKinney further explained that stigma of contamination exists because it would be prudent for Mel Acres to disclose the contamination to any potential buyer to avoid liability, the contamination is documented in TCEQ records, there is a perception of increased "environmental risk" associated with

18

contaminated property, "perception is everything" in real-estate valuation, and based on availability of "a lot" of ranch land in the area, a purchaser has the option to buy property with no stigma rather than property with a stigma.

McKinney opined that the stigma caused lost market value of $1,397,500—a 60% reduction from the unimpaired value. In her report, McKinney recited that she based this opinion on TCEQ's findings of contamination. McKinney calculated the above figure by determining the market values before and after February 19, 2008—the date of TCEQ's initial investigation report, finding HUI was illegally discharging industrial hazardous waste into the culvert. This date preceded further reports ultimately providing competing opinions on whether there was permanent contamination of the large pond: TCEQ's ultimate approval of the ERA, in which Quest concluded there was no unacceptable ecological risk to the large pond, versus Malcolm Pirnie's report finding permanent contamination. Accordingly, McKinney's report supported a finding that even the contamination documented by TCEQ in early 2008 resulted in lost market value due to stigma, irrespective of whether the contamination was remediated or remained ongoing. Moreover, McKinney testified that even if Mel Acres's property is "cleaned up," a permanent stigma remains based on public perception of future risk. Additionally, the jury could have concluded that further TCEQ reports and orders, issued after the initial report but before approval of the ERA, bolstered the attachment of a stigma by more specifically identifying constituents exceeding state action levels detected on-site at HUI's facility, in the culvert, and in the large pond.

Consistent with HUI's position, its damages expert, Rudy Robinson, was retained to provide an opinion on only the amount of alleged temporary damages—loss of use—as opposed to permanent damages. Therefore, Robinson did not provide any estimate on lost market value or negate that there is a stigma. However, on cross-examination, Robinson, a real-estate appraiser who specializes in environmentally contaminated properties, acknowledged the following general concepts or facts specific to the present case, which

supported a finding there is a stigma even from temporary contamination: (1) under certain circumstances, environmental contamination may reduce the market value of property because stigma can deter marketability and development; (2) Mel Acres is a formerly "contaminated property" under the uniform appraisal guidelines, and HUI released materials, including chromium and nickel, which migrated to Mel Acres's property; (3) even remediated property can still be "impacted" in the market, and Robinson has previously advised one of his own clients about a potential discount for remediated property; (4) a purchaser would prefer to acquire property next to a neighbor who has complied with regulations than one who has not; (5) there is a "risk effect" which would concern a potential purchaser because it "all goes to perception"—the potential purchaser may fear that HUI will contaminate Mel Acres's property again; (6) even HUI's environmental expert, Quest, could not eliminate such a possibility; and (7) Mel Acres should disclose any documented contamination as well as the competing opinions of both parties' experts regarding continuing contamination.

The jury heard ample additional evidence supporting a finding that a stigma resulted even from temporary contamination: (1) HUI disposed of spent blast media and other processing materials on the ground for twenty-five years and failed to comply with pertinent environmental regulations; (2) TCEQ determined HUI illegally discharged waste near the culvert to a "surprising" degree and lacked controls to prevent materials from flowing to Mel Acres's large pond; (3) TCEQ detected pH at a hazardous level on HUI's facility—near the culvert—and other constituents exceeding state action levels on HUI's facility, in the culvert, and in the large pond (copper); (4) HUI's environmental expert, Quest, agreed that constituents migrated from HUI's facility to the large pond; and (5) HUI paid Quest $900,000, not only for its analysis relative to this suit but also for remediation efforts.

We recognize that, in the large pond, TCEQ did not detect an elevated level of pH or all of the other constituents exceeding state action levels found on HUI's facility and in the

culvert. Regardless, as explained above, Mel Acres presented evidence that one principle contributing to creation of a stigma is the risk the subject property will become contaminated again. Therefore, the jury could have considered the extent of HUI's former activities and the constituents found even on HUI's facility and in the culvert when determining, at least, that a potential buyer might perceive a future risk that HUI will contaminate Mel Acres's property again

In this regard, we note that HUI asserts TCEQ cited HUI for a pipe leak and characterizes the discharge as an isolated occurrence. However, in its investigation reports, TCEQ did not state that its citations were based solely on a pipe leak but rather discussed the general discharge of materials from the HUI property into the culvert and the employees' daily practice of emptying containers of process material onto the ground. In fact, TCEQ was not informed of the pipe leak until after Mann had visited the site and notified Poenitzsch that HUI was illegally discharging industrial waste into and adjacent to state waters. We recognize there is no data before late 2007 demonstrating how long HUI's discharge may have adversely affected the large pond. On the other hand, we recognize that any such data is lacking because there was no reason for testing until a complaint was lodged in late 2007. Therefore, the lack of data does not foreclose the possibility that contamination of the large pond existed before late 2007; it is a reasonable inference that contaminants in the large pond did not suddenly appear on the eve of the 2007 testing or TCEQ's visit. Thus, the jury could have reasonably concluded that a potential buyer might view contamination of the large pond as having occurred for a significant period before any remediation—a relevant factor considering again that both former contamination and risk of future contamination contribute to creation of a stigma.

In summary, we conclude the evidence is legally and factually sufficient to support a finding that Mel Acres suffered permanent damage in the form of stigma from temporary contamination, resulting in lost market value.

**B.       Lost-Market-Value Calculation**

HUI also challenges McKinney's calculation of lost market value for several reasons: (1) McKinney did not know what constituents contaminated Mel Acres's property; (2) she failed to assign a percentage of the lost market value to any contamination caused by HUI, as opposed to contamination of the background pond; and (3) the calculation was based on flawed methodology.

**1.       Lack of knowledge regarding particular constituents**

First, HUI asserts McKinney could not link her calculation of lost market value to any alleged contamination by HUI because she did not know what constituents contaminated Mel Acres's property.   However, as Mel Acres argues, McKinney was not retained to opine on what constituents contaminated the property and based her opinion on the fact of contamination.   The import of McKinney's opinion is that contamination from HUI caused the lost market value because she cited the TCEQ report, which discussed only HUI's activities.   Therefore, we conclude it was unnecessary for McKinney to articulate what particular constituents contaminated Mel Acres's property to link her opinion regarding lost market value to HUI's activities.

**2.       Contamination of large pond versus background pond**

Next, HUI complains that McKinney could not assign a percentage of the lost market value to any contamination caused by HUI, as opposed to contamination of the background pond.   We recognize that evidence indicated constituents, including pH, iron, and aluminum, exceeding state action levels were measured at various points in a background pond.   However, we cannot foreclose the possibility that the jury did consider such measurements when determining lost market value of Mel Acres's property attributable solely to stigma from contamination of the large pond because the jury assigned an amount significantly less than the figure advanced by McKinney.

Nevertheless, the exceedances of iron and aluminum in the background pond cited by HUI were detected by Malcolm Pirnie over a year after TCEQ's first report, which provided the date on which the market value declined, according to McKinney, and TCEQ's subsequent reports documenting the constituents found on HUI's facility, in the culvert, and in the large pond. Consequently, the jury could have reasonably determined the stigma had already attached before these iron and aluminum levels in the background pond were reported.

The elevated pH in the background pond was detected by Mel Acres's former lessee before the TCEQ investigation. However, this measurement was lower than the pH detected on HUI's facility by TCEQ, the evidence does not conclusively establish the cause of this isolated measurement (whether it was a controllable condition), and the evidence does not establish it had a hazardous effect on the background pond. In contrast, TCEQ detected a hazardous level of pH at HUI's facility, as well as other constituents exceeding state action levels on-site, in the culvert, and in the large pond, emanating from HUI's activities. Again, the jury could have inferred that a potential buyer might consider all these facts and decide the relevant risk is future contamination by HUI—a possibility beyond the buyer's control. Thus, the jury could have reasonably discounted the pH measurement in the background pond as creating or contributing to the stigma.

Finally, it is the large pond which was the focus of the public record available to any potential buyer: TCEQ's reports addressed contamination of the large pond, these reports documented HUI's discharge activities, which could affect only the large pond, and the large pond was the "affected property" for purposes of the APAR and ERA, ordered by TCEQ. HUI does not cite any evidence that a public record exists of a neutral party, TCEQ, addressing alleged contamination of the background pond.

Based on all of the above factors, the jury could have reasonably attributed the stigma to HUI's temporary contamination of the large pond irrespective of the elevated constituents in the background pond.

### 3. McKinney's methodology

Finally, HUI also briefly asserts that McKinney's opinion regarding lost market value was based on flawed methodology. McKinney used the sales-comparison approach by locating other contaminated properties and determining how the market reacts to contamination. McKinney testified she could not locate any contaminated properties in Washington County, so she searched the general area around the county and located two properties in Grimes County: (1) the "Sebastian site"—a sold property; and (2) the "Sheridan site"—a listed property, under contract at the time of trial. McKinney determined the percentage that these respective sales and contract prices decreased from the unimpaired values. McKinney then used that percentage to calculate lost market value of Mel Acres's property. HUI contends that these other properties were not truly comparable.

Relative to the Sebastian site, HUI asserts it "had never been contaminated, was sold as a result of a special relationship, and was not at arms length, but at a price the buyer acknowledges was below market." Robinson, HUI's expert, indeed reported that he called the purchaser, who stated the site was not contaminated. However, McKinney disagreed, explaining a stigma remained on the site because the seller bore a duty to disclose it had been partitioned from a larger property which had been contaminated. Robinson also reported that the purchaser stated he acquired the property from his former employer as a "sweetheart deal" to compensate for early termination of his employment. Although McKinney acknowledged that an important factor in identifying a comparable property is determining whether the sale was an arm's length transaction, she did not necessarily agree that a "sweetheart deal" fails to constitute an arm's length transaction. Further, on cross-examination, Robinson agreed that he did not ascertain the terms of the "sweetheart deal" and suggested that other than obtaining the sales documents, he did not independently verify the information relayed by the purchaser regarding the "sweetheart deal."

Nonetheless, even if the jury disregarded McKinney's use of the Sebastian site as a comparable, the jury could have nonetheless considered McKinney's use of the Sheridan site as a comparable. HUI asserts that McKinney "incorrectly assumed the [Sheridan site], a superfund site that had thousands of cubic yards of affected soils and sediments above state action levels, had been remediated to below state action levels."

Contrary to HUI's suggestion, a document presented at trial, which discussed previous remediation procedures for the Sheridan site, indicated groundwater was also contaminated, rather than just soils and sediments. Regardless, McKinney testified that the type of contamination, whether soil or water, is not dispositive toward determining whether there is a stigma.

In an attempt to impeach McKinney's testimony that the Sheridan site had been remediated to below state action levels, HUI also emphasized that the above-cited document mentioned alternative concentration levels had been set for monitoring ground water, as apparent deviations from typical state or federal protective concentration levels. However, Robinson agreed that, although the Sheridan site is not "clean," it has been subjected to a "form" of remediation. Moreover, Robinson acknowledged that, under applicable guidelines, an appraiser is permitted to exercise professional judgment relative to whether adjustments should be made to account for attempted, but uncompleted, remediation when deciding whether a comparable property is suitable for use in appraising the subject property.

We acknowledge HUI presented evidence that the Sheridan site, as a Superfund site monitored by the federal government and placed on a "national priority list," involved a far greater degree of contamination than Mel Acres's large pond. Robinson explained that the Sheridan site was monitored for thirty years at a cost of $16-17 million, and some constituents at that site were "off the Richter scale" when compared to regulatory limits.

On the other hand, the evidence does not support HUI's suggestion that its actions resulted solely from an isolated pipe leak; instead, as discussed above, Mel Acres presented

25

evidence that HUI disposed of industrial waste next to the culvert for twenty-five years, TCEQ detected a "surprising" degree of discharge, including constituents exceeding state action levels and pH at hazardous levels, TCEQ maintained a public record of HUI's activities, TCEQ's enforcement action was still open at the time of trial because the APAR of Mel Acres's large pond had not yet been approved, some constituents remained in Mel Acres's large pond even if those exceeding state actions levels were not caused by HUI's activities, HUI spent $900,000 for its expert to consult relative to not only this litigation but also remediation, and regardless of whether constituents remained in Mel Acres's large pond, HUI's above-cited activities were relevant to the stigma determination; i.e., risk of future contamination of the large pond. Further, McKinney explained a perfect comparable would be a property "exactly like" the same property but she has never encountered that situation. McKinney expressed confidence in the comparables she used and believed they reflected the market's perception even though they were not "perfect." Even Robison admitted that it is difficult to find a comparable property "particularly on environmental sites." In this regard, the jury could have rationally inferred that calculating lost market value of Mel Acres's property was not an exact science because there were few comparable properties for the analysis, much less any properties with the exact nature of contamination as Mel Acres's property, plus the calculation involved some degree of speculation regarding how a prospective buyer might react to the former contamination. Notably, HUI's expert, Robinson, did not provide any controverting figure because his review was limited to determining temporary damages for loss of use.

Therefore, we conclude that HUI criticisms did not conclusively negate McKinney's use of the Sheridan site as a comparable and her opinion regarding lost market value of Mel Acres's property; rather, the criticisms were merely factors relevant to credibility of her opinion, and the jury was free to decide what weight to assign such factors. Accordingly, this situation is distinguishable from *Royce Homes* (cited by our dissenting colleague) because McKinney's opinion was not based merely on her conversations with various professionals. *Cf.* 244 S.W.3d at 578–80. Indeed, the verdict

26

indicates the jury may have considered the differences between contamination of Mel Acres's property and the Sheridan site because it found Mel Acres lost market value of $349,312.50—significantly lower than the figure advanced by McKinney ($1,397,500). The jury's figure reflected a 15% reduction in value—not the 60% reduction espoused by McKinney.[5]   Under all the above circumstances, we cannot conclude the evidence was legally or factually insufficient to support the jury's finding.

Accordingly, we overrule HUI's second and third issues.

### III.  JURY FINDING ON PERMANENT DAMAGE

In its first issue, HUI contends that we must reverse and render judgment for HUI because Mel Acres failed to obtain a jury finding on the essential element of permanent injury resulting from HUI's negligence.

Relative to negligence, the jury answered "Yes" to the following question with respect to HUI:

QUESTION NO. 2

> Did the negligence, if any, of those named below proximately cause the occurrence or injury in question?
>
> The law forbids a person or company from discharging industrial waste into or adjacent to any water in the State. A failure to comply with this law is negligence in itself.
>
> The law forbids a person or company to cause, suffer, allow, or permit the collection, handling, storage, processing, or disposal of industrial solid waste in such a manner as to cause the discharge or imminent threat of discharge of industrial solid waste into or adjacent to the waters in the State without obtaining specific authorization for such discharge from the Texas Commission on Environmental Quality. A failure to comply with this law is negligence in itself.

---

[5] McKinney opined, and Robinson agreed, that market value of the property before any impairment was $2,329,000.

Relative to damages, the jury was instructed to answer the following question if it answered "Yes" for any party to Question 1 (concerning nuisance), Question 2 (quoted above), or Question 3 (concerning trespass):

QUESTION NO. 5

What is the difference between the market value of the real property owned by Mel Acres Ranch in Washington County, Texas before the occurrence in question, and the market value of such property after the occurrence in question?

"Market value" means the amount that would be paid in cash by a willing buyer who desires to buy, but is not required to buy, to a willing seller who desires to sell, but is under no necessity of selling.

Answer in dollars and cents for damages, if any.

The jury answered, "$349,312.50."

According to HUI, Mel Acres was required to obtain a separate jury finding on permanent injury to the property prerequisite to recovery of any lost market value. HUI cites the principle that a plaintiff bears the burden to obtain affirmative jury findings on every necessary element of its claim. *See Ramos v. Frito-Lay, Inc.*, 784 S.W.2d 667, 668 (Tex. 1990). HUI also cites *State Department of Highways & Public Transp. v. Payne*, 838 S.W.2d 235, 241 (Tex. 1992) for the proposition that, when a plaintiff fails to request an affirmative finding regarding an omitted element and the defendant objects to the missing element, the trial court must render judgment for the defendant. As HUI asserts, it objected in the trial court to lack of a separate jury question on whether Mel Acres sustained a permanent injury.

HUI's contention seems based on its premise that Mel Acres could not recover lost market value absent a permanent *physical* injury to the property. However, as discussed above, we have rejected this premise because the law does not preclude Mel Acres from recovering lost market value due to permanent stigma resulting even from temporary physical injury. To the extent HUI contends that Mel Acres was required to obtain a

28

separate, express finding of permanent damage, even in the form of this stigma, as prerequisite to recovery of lost market value, we disagree.

Uncontroverted issues need not be submitted to the jury. *City of Keller*, 168 S.W.3d at 814–15 (citing *Sullivan v. Barnett*, 471 S.W.2d 39, 44 (Tex. 1971); *Wright v. Vernon Compress Co.*, 296 S.W.2d 517, 523 (Tex. 1956); *Clark v. Nat'l Life & Accident Ins. Co.*, 200 S.W.2d 820, 822 (Tex. 1947); *S. Underwriters v. Wheeler*, 123 S.W.2d 340, 341 (Tex. 1939)). Mel Acres presented uncontroverted evidence that it suffered permanent damage in the form of a stigma on the property as a result of HUI's negligence in discharging industrial waste into state waters, which waste flowed to Mel Acres's large pond. As noted above, HUI's damages expert, Robinson, did not negate or otherwise dispute that there is a stigma on the property. Even on appeal, HUI does not dispute existence of a stigma, arguing instead that existence of a stigma is insufficient as a matter of law to constitute permanent damage absent ongoing physical injury. Because we have concluded that stigma damages are recoverable as permanent damages to property under Texas law, the uncontroverted evidence of a stigma on Mel Acres's property satisfied the permanent-damage requirement. Consequently, we conclude that Mel Acres was not required to obtain a separate finding of permanent damage, and the only issue remaining for the jury was determining the dimunition in market value resulting from the permanent stigma—an issue submitted to the jury via the inquiry regarding the difference in market value before and after the occurrence. Accordingly, we overrule HUI's first issue.

We affirm the trial court's judgment.


/s/      Charles W. Seymore
         Justice

Panel consists of Justices Seymore, Boyce, and Mirabal (Boyce, J., dissenting).[6]

_____

[6] Senior Justice Margaret Garner Mirabal sitting by assignment.

29